Ray D. Hacke, OSB #173647
PACIFIC JUSTICE INSTITUTE
317 Court St. NE, Ste. 202
Salem, OR 97301
(503) 917-4409 Phone
(916) 857-6902   Facsimile

Attorneys for Plaintiff
JENNIFER HODGES

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

MEDFORD DIVISION

| | |
|---|---|
| JENNIFER HODGES, An Individual,<br><br>Plaintiff,<br><br>*v.*<br><br>EAGLE POINT SCHOOL DISTRICT NO. 9, An Oregon Public Body,<br><br>Defendant | Case No.:<br><br>**COMPLAINT FOR DAMAGES FOR DEPRIVATION OF FREEDOMS OF SPEECH AND RELIGION [42 U.S.C. § 1983] AND RELIGIOUS DISCRIMINATION IN VIOLATION OF TITLE VII [42 U.S.C. § 2000e *et seq.*] AND ORS 659A.030(1)(a)**<br><br>**JURY TRIAL REQUESTED** |

Plaintiff JENNIFER HODGES hereby alleges as follows:

## **INTRODUCTION**

1.      This is a complaint for constitutional violations and employment discrimination brought by Plaintiff, a teacher formerly employed by Defendant EAGLE POINT SCHOOL DISTRICT NO. 9 ("EPSD" or the "District").

2.      Plaintiff alleges, *inter alia*, that EPSD discharged and discriminated against her on the basis of religion; failed to accommodate her sincerely held religious beliefs, as required under both Title VII and ORS 659A.030; attempted to

compel her to abandon or violate her sincerely held religious beliefs and retaliated against her for not doing so; subjected her to a hostile work environment; violated her freedoms of religion and speech; and ultimately fired her under false pretenses.

3.    The gravamen of this complaint is that EPSD demanded that Plaintiff use students' self-selected names rather than the names listed in her gradebook and use those students' preferred pronouns in violation of her sincerely held religious beliefs.  The District refused to consider reasonable alternatives to its demands, instead allowing students and staff to openly disrespect Plaintiff – thus preventing her from effectively performing her job-related duties – and ultimately firing her for not conforming to EPSD's ideology on LGBT+ issues.

## PARTIES

4.    Plaintiff refers to and hereby incorporates the foregoing paragraphs as though fully set forth herein.

5.    Plaintiff is, and at all times relevant herein was, a teacher with more than two decades of experience and a former employee of EPSD, for whom she taught at Eagle Point High School ("EPHS"), a school governed and operated by the District, for two years.

6.    Plaintiff is also, and at all times relevant herein was, a devout Christian – making her a member of a protected class for purposes of both Title VII and ORS 659A.030 – who sincerely believes (1) God creates all persons male and female; (2) a person's gender is determined by biology (DNA, genitalia, etc.), not by how a person "self-identifies"; and (3) gender is an immutable characteristic that cannot be changed regardless of what artificial attempts to change it a person undergoes, be it hormone treatments or surgical procedures.

7.    Accordingly, Plaintiff believes that to affirm one's self-proclaimed transgender status in any way – whether by using a transgender person's chosen name rather than their legal, given name, using the person's preferred pronouns,

etc. – constitutes rejecting God's authority and bearing false witness (i.e., lying), both of which the Bible explicitly prohibits.

8.      Defendant EPSD is, and at all times relevant herein was, a public school district and a public body as defined in ORS §§ 30.260(4)(b) and 174.109. EPSD is also, and at all times herein was, a "body corporate" that may sue and be sued under ORS 332.072 and satisfies any damages obligations owed to tort claimants from its own liability insurance, not from state funds.

## JURISDICTION

9.      Plaintiff refers to and hereby incorporates the foregoing paragraphs as though fully set forth herein.

10.      This Court has jurisdiction over Defendants pursuant to 28 U.S.C. § 1331 because Plaintiff's action arises under the U.S. Constitution and laws of the United States.

11.      This action also concerns civil rights pursuant to 28 U.S.C. § 1343.

12.      This Court has supplemental jurisdiction over the state law claim(s) asserted herein pursuant to 28 U.S.C. § 1367(a) in that such claims are related to and form part of the same case and controversy as Plaintiff's federal claims.

## VENUE

13.      Plaintiff refers to and hereby incorporates the foregoing paragraphs as though fully set forth herein.

14.      Venue is proper in the Court's Medford Division pursuant to 28 U.S.C. § 1391 because all of the relevant events giving rise to this Complaint, or a substantial part thereof, occurred in the County of Jackson and all parties are located in, employed in, and/or residents of the County of Jackson.

## GENERAL ALLEGATIONS

15.      Plaintiff refers to and hereby incorporates the foregoing paragraphs as though fully set forth herein.

16.    Plaintiff is, and at all times relevant herein was, a professing Christian who strives to live out her faith daily.  Plaintiff holds, and at all times relevant herein held, sincere religious beliefs that govern her views about human nature and ethical and moral standards that should govern human conduct.

17.    Plaintiff's faith teaches her that (1) God creates all persons either male or female; (2) a person's gender is determined by biology (DNA, genitalia, chromosomes, etc.), not by how a person "self-identifies"; and (3) gender is an immutable characteristic that one cannot change regardless of what artificial changes a person undergoes, be it hormone treatments, surgical procedures, etc.

18.    Plaintiff's Christian faith prohibits her from affirming as true those ideas and concepts that the Bible declares are not true. Doing so, she believes, would violate biblical commands requiring her to submit to God's authority and prohibiting dishonesty and lying.

19.    In accordance with biblical principles, Plaintiff also endeavors to treat every person with dignity, love, and care because she believes all people are created in the image of God.  For this reason, Plaintiff made it a point to call students by the names listed in her gradebook: She would not refer to students by any preferred names that her gradebook did not reflect, be they nicknames – for instance, she would not call a student named Daniel (or Danielle) "Danny" or even "Dan" – or completely new names that the students had hand-picked for themselves.  In doing so, Plaintiff strove not only to treat all her students fairly and equally, but foster an environment of dignity, love, and care for those students.

20.    On September 8, 2021 – the first day of the District's 2021-22 school year – Plaintiff opened her fifth-period government class by explaining her policies concerning students' names and displaying good manners and respect for others.

21.    One student, who will hereinafter be referred to as "Student X," asked Plaintiff why she would not honor transgender students' preferred names if respect

mattered so much to her.  Plaintiff explained that she was treating everyone fairly and equally by calling students by the names listed in her gradebook.

22.    Student X responded by yelling at Plaintiff, accusing her of "dead naming" – i.e., referring to a transgender person by the legal name given to the person by the person's parents rather than the person's self-selected name – and asserting that people like Plaintiff are "the reason all transgender kids try to kill themselves."

23.    Plaintiff attempted, unsuccessfully, to de-escalate the situation: Student X became angrier and angrier, ranting for roughly 30 to 40 minutes before threatening to leave – and then ultimately storming out of – Plaintiff's classroom.

24.    Plaintiff did not write a behavioral referral for Student X, but rather made a mental health referral to the guidance counselor because Student X had exhibited a concerning amount of elevated anger.

25.    Plaintiff also informed her supervisor, Jen Mason, of the incident. Ms. Mason never indicated to Plaintiff that she had done anything wrong.

26.    After the incident, Plaintiff became the target of harassment by both students and staff at EPHS: The same day as Student X's outburst, another student whom Plaintiff had never met came up to Plaintiff and accused her of being "disrespectful," "cruel," a "transphobe," and a "terrible and disrespectful person."

27.    The day after Student X's outburst, another student left a copy of Plaintiff's syllabus on her desk with the word "respect" circled in red.  Plaintiff also reported this incident to Ms. Mason.  In response, Ms. Mason said that the students were acting inappropriately and indicated she would investigate the matter to hold the students accountable.

28.    On September 20, 2021, EPHS' assistant principal, Aaron Luksich, held the first of a series of meetings with Plaintiff in which Mr. Luksich pressured Plaintiff to change her position concerning students' preferred names.

29.    At one of those meetings, Mr. Luksich produced copies of District policies allegedly requiring Plaintiff to use transgender students' preferred names – even if it went against the wishes of the students' parents or guardians – and ordered Plaintiff to follow said policies.

30.    Plaintiff informed Mr. Luksich that she did not feel comfortable doing that for professional, ethical, and religious reasons.

31.    Student X's disrespect toward Plaintiff was by no means limited to a single incident – it continued well into the next semester.  At one point, while Plaintiff was talking with another student and asking how she could help that student, Student X walked past and muttered, "Be less transphobic."

32.    Plaintiff responded by taking Student X to the principal's office to face disciplinary action.  En route, Student X began referring to Plaintiff by her first name – Jennifer – and yelling things like, "Don't you like legal names, Jennifer?"  Student X also kept insulting Plaintiff, calling her "transphobic" and "a killer of transgender kids."

33.    Despite Student X's consistent pattern of disrespect toward Plaintiff, EPHS officials never took corrective action against Student X, thereby allowing Student X's behavior to continue unabated and at least tacitly encouraging other students to behave similarly toward Plaintiff.

34.    Over the next two days after Plaintiff took Student X to EPHS' principal's office, students sent Plaintiff screenshots informing her of a student group forming against her.

35.    On February 9, 2022, Student X and other students gathered outside Plaintiff's classroom to protest against her, with Student X holding a sign that read, "Transphobes kill kids."  Plaintiff responded by getting a substitute teacher to take over her classroom and leaving for the rest of the day, as she felt the atmosphere to be too toxic to perform her duties effectively.

36.    Rather than punish Student X and the other protesters for disrupting her class – especially since Student X and the other protesters presumably should have been in class themselves at the time – EPHS administrators held a series of meetings with Plaintiff over the course of the next week.  At one of these meetings, on February 14, 2022, EPHS' principal, Heather Marinucci ("Principal Marinucci"), informed Plaintiff that EPSD would not be renewing her contract for the 2022-23 school year because she was "not a good fit."

37.    Students were not the only ones demonstrating disrespect toward Plaintiff, either: Many fellow teachers at EPHS either ostracized her, mistreated her, or openly displayed hostility toward her because of her beliefs.  At least one of Plaintiff's colleagues sent a text to another teacher calling Plaintiff "transphobic."

38.    Even some teachers whom Plaintiff considered friends disassociated themselves from Plaintiff, telling her, "We don't want to be targeted next."

39.    EPSD teachers and administrators also directed hostility toward Plaintiff's teenage son, who was in middle school at the time.  In fact, an openly pro-LGBT+ teacher kicked Plaintiff's son, a generally well-behaved student who typically earned good grades, out of class on multiple occasions, especially when Plaintiff's son – who shares his mother's Christian faith and values – expressed discomfort with the teacher pushing a pro-LGBT+ agenda in class at the expense of teaching the subject the teacher was hired to teach.

40.    On or about February 16, 2022, the District placed Plaintiff on paid administrative leave pending an investigation into her conduct.

41.    While on leave, Plaintiff was not permitted to set foot on any of EPSD's campuses – even in her capacity as the parent of an EPSD student – without getting the District's permission 24 hours in advance.  This means EPSD effectively prohibited Plaintiff from attending her son's school sports events.

42.     The requirement that Plaintiff request permission to attend her son's school sports events was humiliating for Plaintiff, imposed by EPSD for no other purpose than to make clear she was not welcome on EPSD campuses.

43.     Plaintiff furthermore reasonably feared that if she did attend her son's sports events, a confrontation with District staff who opposed her religious views would occur and cause discomfort and embarrassment to her son.

44.     On May 9, 2022, EPSD terminated Plaintiff's employment for allegedly giving a student in a credit recovery class a grade the student did not earn.  The reason asserted for Plaintiff's firing was pretextual – i.e., a false pretense: The true reason for EPSD's termination of Plaintiff's employment was Plaintiff's adherence to her sincerely held religious beliefs prohibiting her from using transgender students' preferred names.

45.     EPSD later sought to have Oregon's Teacher Standards and Practices Commission ("TSPC") revoke her teaching license for allegedly giving a student an unearned grade.  The TSPC found the District's accusation to be meritless and absolved Plaintiff of any wrongdoing.

46.     Unable to find employment as a teacher in Oregon after EPSD fired her, Plaintiff relocated to North Carolina, where she has found work with a school district that pays her $31,000 less than she earned at EPSD.

47.     Due to the District's termination of her employment has suffered non-economic damages, including but not limited to emotional distress, sometimes-crippling anxiety, depression, financial stress, familial stress, anger, ostracization, loss of friendships, and reputational harm.

48.     Attached hereto as **Exhibit "A"** is a true and accurate copy of a letter that Plaintiff submitted to EPSD – with Student X's name redacted – as required under Oregon's Tort Claims Act.  *See* Or. Rev. Stats. § 30.275(2).

49.    As a condition of filing this lawsuit, Plaintiff has obtained a right-to-sue letter from Oregon's Bureau of Labor & Industries.  A true and accurate copy of that letter is attached hereto as **Exhibit "B."**

50.    Attached hereto as **Exhibit "C"** is a printout from the website TimeandDate.com showing when the 90-day statute of limitations set forth in Plaintiff's right-to-sue letter is set to expire.  Plaintiff has attached these printouts hereto as proof that she has timely filed this lawsuit.

<u>**FIRST CAUSE OF ACTION**</u>
**Deprivation of Freedom of Speech**
**[U.S. Const. amends. I & XIV; 42 U.S.C. § 1983]**

51.    Plaintiff refers to and hereby incorporates the foregoing paragraphs as though fully set forth herein.

52.    Under 42 U.S.C. § 1983, public bodies like Defendant EPSD can be held liable for constitutional rights violations that arise from government action or, alternatively, deliberate inaction when action is required.

53.    The U.S. Constitution's First Amendment, made applicable to states via the Fourteenth Amendment, prohibits public bodies like Defendant EPSD from infringing on individuals' freedom of speech without due process of law.

54.    Acting under color of state law, Defendant EPSD violated Plaintiff's constitutionally protected freedom of speech by attempting to compel Plaintiff to use students' chosen names and pronouns, then punishing her for not doing so.

55.    Plaintiff's refusal to use students' chosen names and pronouns was a constitutionally protected activity, as the First Amendment prohibits government actors from compelling individuals – even their employees – from speaking messages with which they disagree, on religious grounds or otherwise.

56.    By attempting to compel Plaintiff to conform to Defendant EPSD's ideology concerning students' preferred names and pronouns and then firing

Plaintiff – and attempting to get her teaching license revoked under false pretenses – for not doing so, the District engaged in actions that would chill a person of ordinary firmness from continuing to engage in the protected activity.

57.    Plaintiff's protected activity was a substantial or motivating factor in Defendant EPSD's conduct: But for Plaintiff's religiously based refusal to call students by any name other than what was in her gradebook, the District would not have taken actions aimed at either compelling Plaintiff to violate her beliefs or punishing Plaintiff for not doing so.

58.    Defendant EPSD cannot show that it would have taken the same adverse employment actions against Plaintiff – placing her on paid administrative leave and then firing her – in the absence of Plaintiff's protected conduct.

59.    Defendant EPSD's actions neither serve a compelling government interest nor are narrowly tailored to serve such an interest.

60.    Based on the foregoing, Defendant EPSD has violated Plaintiff's freedom of speech under the First Amendment and should accordingly be held liable for damages under 42 U.S.C. § 1983.

## SECOND CAUSE OF ACTION
### Deprivation of Religious Freedom
### [U.S. Const. amends. I & XIV; 42 U.S.C. § 1983]

61.    Plaintiff refers to and hereby incorporates the foregoing paragraphs as though fully set forth herein.

62.    Under 42 U.S.C. § 1983, public bodies like Defendant EPSD can be held liable for constitutional rights violations that arise from government action or, alternatively, deliberate inaction when action is required.

63.    The U.S. Constitution's First Amendment, made applicable to states through the Fourteenth Amendment, prohibits public bodies like Defendant EPSD from infringing on individuals' freedom of religion without due process of law.

64.     As the Supreme Court recognized in *Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407 (2022), the First Amendment's Free Exercise and Free Speech clauses work in tandem: While the Free Speech Clause protects speech regardless of whether it is religious in nature, the Free Exercise Clause provides overlapping protection for religion-related expression. *Id.* at 2421.

65.     The Supreme Court also declared in *Kennedy* that teachers do not shed their right to religious expression at the schoolhouse gate.  While this does not give teachers *carte blanche* to "deliver any message to anyone anytime they wish" – especially since teachers are government employees paid in part to speak on the government's behalf and convey its intended messages – the First Amendment also prohibits government entities such as EPSD and officials such as the Supervisors from "lend[ing] [their] power to one or the other side in controversies over religious authority or dogma" and "punish[ing] the expression of doctrines it believes to be false." *Emp't Div., Ore. Dep't of Human Resources v. Smith*, 474 U.S. 872, 877 (1990).

66.     In attempting to coerce Plaintiff to use students' chosen names and pronouns, Defendant EPSD lent its power to one side in a controversy over religious dogma – specifically, the controversy over whether refusal to use students' chosen names and pronouns is harmful to LGBT+ kids.

67.     When Plaintiff refused to embrace Defendant EPSD's orthodoxy concerning students' names and pronouns for religious reasons, Defendants punished her by firing her.  This, the First Amendment does not allow.

68.     Based on the foregoing, Defendants have violated Plaintiff's freedom of religion under the First Amendment and should accordingly be held liable for damages under 42 U.S.C. § 1983.

## THIRD CAUSE OF ACTION
### Violation of Title VII – Failure to Accommodate Religious Beliefs
### [42 U.S.C. § 2000e *et seq.*]

69.     Plaintiff refers to and hereby incorporates the foregoing paragraphs as though fully set forth herein.

70.     Title VII requires employers to accommodate employees' religious beliefs and practices where the employers can do so without undue hardship.

71.     For purposes of Title VII, "[t]he term 'employer' means a person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year …" 42 U.S.C. § 2000e(b).  The term "person" includes governments.  42 U.S.C. § 2000e(a).

72.     Defendant EPSD qualifies, and at all times relevant herein qualified, as an employer under Title VII.

73.     At all times relevant herein, Plaintiff was either an employee or a former employee of Defendant EPSD.

74.     The term "religion," for purposes of Title VII, "includes all aspects of religious observance and practice, as well as belief[.]" 42 U.S.C. § 2000e(j).

75.     As a practicing Christian, Plaintiff is, and at all times relevant herein was, part of a class of persons protected by Title VII.  42 U.S.C. § 2000e-2(a)(1).

76.     Plaintiff holds, and at all times relevant herein held, a sincere religious belief that prohibits her from using students' preferred names or pronouns, as doing so constitutes not only a rejection of God's authority concerning whom He has made male or female, but lying – both of which the Bible prohibits.

77.     Plaintiff's sincerely held religious belief conflicted with her employment-related duty to use transgender students' preferred names and pronouns pursuant to EPSD policy.

78.     Through her dealings with Aaron Luksich, EPHS' assistant principal, Plaintiff informed her employer, Defendant EPSD, of the conflict between her sincerely held religious beliefs and her employment-related duty to use students' preferred names and pronouns.

79.     Defendant EPSD responded to Plaintiff's assertion of the conflict between her sincerely held religious belief and her employment-related duty to use students' preferred names and pronouns by subjecting her to multiple adverse employment actions – first by informing Plaintiff, through Principal Marinucci, on February 14, 2022 that her contract would not be renewed following the 2021-22 school year; second, by placing Plaintiff on paid administrative leave; and finally, by terminating Plaintiff's employment under false pretenses on May 9, 2022.

80.     Defendant EPSD offered Plaintiff no religious accommodations even though reasonable accommodations were available – specifically, the accommodation of letting Plaintiff call her students by the names entered into her gradebook.  This measure would have let Plaintiff continue working without violating her beliefs while serving EPSD's interest in ensuring that students, regardless of gender identity, are treated with proper dignity and respect.

81.     Defendant EPSD would have incurred no undue hardship by accommodating Plaintiff's sincerely held religious beliefs: Plaintiff's policy of addressing and referring to students by the names in her gradebook applied to all students, regardless of what gender they self-identified as.  If a transgender student wished to go by a different name, the student could easily have changed the name in Plaintiff's gradebook, and Plaintiff would have called the student by that name. The District would have incurred virtually no increased costs – let alone substantial increased costs – in allowing Plaintiff to operate in accordance with this policy.

82.     Animus toward Plaintiff's religious beliefs motivated Defendant EPSD to fire Plaintiff, any assertion by the District to the contrary notwithstanding.

83.     Based on the foregoing, Defendant EPSD has violated Title VII. Plaintiff thus prays for damages accordingly.

### FOURTH CAUSE OF ACTION
### Violation of Title VII – Harassment/Hostile Work Environment
### [42 U.S.C. § 2000e *et seq.*]

84.     Plaintiff refers to and hereby incorporates the foregoing paragraphs as though fully set forth herein.

85.     Harassment is a form of discrimination prohibited under Title VII.

86.     As a practicing Christian, Plaintiff is, and at all times relevant herein was, part of a class of persons protected by Title VII.  42 U.S.C. § 2000e-2(a)(1).

87.     During the fall and winter of the 2021-22 school year, Defendant EPSD at minimum allowed, and at worst directed, persistent, unwelcome conduct toward Plaintiff based on her religious beliefs.  Such conduct came not only from colleagues and supervisors – Principal Marinucci and Mr. Luksich included – but also students who openly disrespected Plaintiff and interfered with her ability to effectively provide instruction to her students and maintain order in her classroom.

88.     Typically, students who behave toward teachers in such a disrespectful, disruptive manner are subject to discipline, including after-school detention, suspension, and in extreme cases, expulsion from school.  Because Defendant EPSD was hostile toward Plaintiff's sincerely held religious beliefs, however, EPSD allowed students' disrespectful conduct toward Plaintiff to persist unchecked, issuing no consequences to Student X or any other student.

89.     Defendant EPSD also subjected Plaintiff to a series of meetings throughout the 2021-22 school year in which District officials – Principal Marinucci and Mr. Luksich in particular – either pressured Plaintiff to abandon or violate her sincerely held religious beliefs concerning LGBT+-affirming names and pronouns or informed her that the likes of her were not welcome to work for the District.

90.     Defendant EPSD even allowed staff members to demonstrate hostility toward Plaintiff by subjecting her son to hostile treatment.

91.     The only way Plaintiff could conceivably get Defendant EPSD to apply the brakes to the steady stream of harassment and hostility she and her son experienced was to abandon her sincere religious beliefs.

92.     The offensive and pervasive conduct at minimum allowed, and at maximum directed, by Defendant EPSD made it extremely difficult, if not impossible, for Plaintiff to continue working for the District.  At one point, she even had to leave her class and have a substitute take over because of the toxic working environment that EPSD fostered.

93.     A reasonable employee whose beliefs were treated in a similar manner would have considered Defendant EPSD's conduct to be intimidating and abusive.

94.     Instead of correcting the offensive conduct that students and staff directed toward Plaintiff, Defendant EPSD effectively ratified it by placing Plaintiff on paid administrative leave and ultimately firing her under false pretenses.

95.     Defendant EPSD's permissive, if not active, creation of a harassing and hostile work environment has caused Plaintiff to suffer both economic and non-economic harm in amounts according to proof and to be determined by a jury.

96.     Based on the foregoing, Defendant EPSD has violated Title VII. Plaintiff thus prays for damages accordingly.

### FIFTH CAUSE OF ACTION
**Violation of Title VII – Retaliation**
**[42 U.S.C. § 2000e *et seq.*]**

97.     Plaintiff refers to and hereby incorporates the foregoing paragraphs as though fully set forth herein.

98.     Title VII prohibits an employer from taking an adverse action against an employee because the employee engaged in a protected activity.

99.    Plaintiff engaged in a protected activity by attempting to comply with
the teachings of her Christian faith to the greatest extent possible while performing
her job-related duties.  Specifically, Plaintiff sought to demonstrate respect and
sensitivity to all of her students – LGBT+ or otherwise – in a manner that avoided
discriminating against them while, at the same time, was in line with her sincerely
held religious beliefs.

100.    Defendant EPSD retaliated against Plaintiff's engagement in the
protected activity by (1) letting students and staff mistreat her for several months
unabated, (2) opting not to renew Plaintiff's contract, (3) placing Plaintiff on paid
administrative leave, (4) firing Plaintiff, and (5) seeking to have the TSPC revoke
Plaintiff's teaching license after the District had terminated her employment.

101.    Roughly five months after Plaintiff engaged in her protected activity –
and following numerous meetings aimed at convincing Plaintiff to stop engaging in
that protected activity – Defendant EPSD informed Plaintiff through Principal
Marinucci that EPSD would not be renewing her contract for the 2022-23 school
year because she was "not a good fit" for the District.  EPSD placed Plaintiff on
paid administrative leave two days later, fired her approximately three months after
that, and then sought to have the TSPC revoke her teaching license.

102.    The close proximity of Plaintiff's protected activity to the multiple
adverse actions Defendant EPSD took against her raises an inference of retaliation.

103.    Defendant EPSD's attempt to get the TSPC to revoke Plaintiff's
teaching license in the aftermath of her firing makes the inference of retaliation in
this case even stronger: It indicates the District's desire not merely to part ways
with Plaintiff because she was "not a good fit" with EPSD, as Principal Marinucci
told her.  The District wanted to punish Plaintiff for refusing to abandon her beliefs
by trying to make it virtually impossible for her ever to work as a teacher in
Oregon – if not every other state in the union, for that matter – ever again.

104.    Defendant EPSD's retaliation against Plaintiff has caused and continues to cause Plaintiff both economic and non-economic harm.  This is particularly true given that Plaintiff had to relocate to North Carolina and accept a $31,000-a-year pay cut to continue working as a teacher.

105.    Based on the foregoing, Defendant EPSD has violated Title VII. Plaintiff thus prays for damages accordingly.

## SIXTH CAUSE OF ACTION
### Violation of State Employment Law
### [ORS 659A.030(1)(a)]

106.    Plaintiff refers to and hereby incorporates the foregoing paragraphs as though fully set forth herein.

107.    Like Title VII, ORS 659A.030(1)(a) prohibits employers from discharging individuals from employment on the basis of religion.

108.    Because (1) Oregon's state law prohibiting employers from discriminating on the basis of religion is modeled after Title VII and (2) analyses for religious discrimination claims under both statutes is accordingly identical, Plaintiff declines to restate the facts as set forth in her third, fourth, and fifth causes of action, which are already incorporated as though fully set forth herein.

109.    Under 42 U.S.C. § 2000e-7, nothing in 42 U.S.C. § 1981a(b)(3), which caps the amount of non-pecuniary and punitive damages that can be awarded to Plaintiff, "shall be deemed to exempt or relieve any person from liability, duty, penalty, or punishment provided by any present or future law of any State[.]"  In other words, an Oregon jury is free to exceed any applicable federal dollar limit in accordance with Oregon law.

110.    Under Oregon law, a jury may award up to $500,000 in noneconomic damages.  *See* ORS 31.710(1).  Oregon law defines "noneconomic damages" to include "subjective, nonmonetary losses, including but not limited to … mental

suffering, emotional distress, ... inconvenience and interference with normal and usual activities apart from gainful employment." ORS 31.705(2)(b)

111.   As stated *supra*, Plaintiff has endured mental suffering and emotional distress due to Defendant EPSD's unlawful discrimination against her.

112.   Based on the foregoing, Defendant EPSD has violated ORS 659A.030(1)(a).  Plaintiff thus prays for damages accordingly.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully request that this Court enter judgment against Defendants and provide Plaintiff with the following relief:

A. For economic damages in an amount according to proof at trial;

B. For non-economic damages in an amount according to proof at trial;

C. For punitive damages in an amount according to proof at trial;

D. For attorney's fees and costs associated with bringing and maintaining this action in accordance with the law; and

E. For such other and further relief as the Court may deem proper.

Dated: September 21, 2023            PACIFIC JUSTICE INSTITUTE
\_\_/s/ *RAY D. HACKE*_____
Ray D. Hacke
Attorneys for Plaintiff
JENNIFER HODGES

# EXHIBIT "A"



August 8, 2022

**SUBMITTED VIA E-MAIL & REGULAR MAIL**
Andy Kovach
Superintendent
c/o Stacey Morgan
Eagle Point School District
11 North Royal Ave.
Eagle Point, OR 97524
E-mail: morgans@eaglepnt.k12.or.us

Heather Marinucci
Principal
Eagle Point High School
203 N. Platt St.
Eagle Point, OR 97524
E-mail: marinuccih@eaglepnt.k12.or.us

> **Re: Notice of Tort Claim**
> **Claimant: Jennifer Hodges, 413 Finley Way, Eagle Point, OR 97524**
> **Dates of Injuries: Feb. 14, 2022 and May 19, 2022**
> **Claimant's Attorney: Ray D. Hacke, Pacific Justice Institute**
> **P.O. Box 5229, Salem, OR 97304**

Dear Ms. Kovach and Ms. Marinucci:

The Pacific Justice Institute ("PJI"), a non-profit law firm whose mission includes assisting public employees facing religious discrimination and government encroachments on those employees' freedoms of speech, represents Jennifer Hodges ("Ms. Hodges"), a former employee of the Eagle Point School District ("EPSD" or the "District") who taught at Eagle Point High School ("EPHS"). This letter's purpose is to inform you of Ms. Hodges' intent to sue EPSD and certain of its officers, agents, and employees acting on behalf of the District – specifically, the two of you – for declaratory relief, injunctive relief, economic damages, non-economic damages, punitive damages, and any other relief that the court deems proper. Ms. Hodges has already taken steps toward filing a complaint with Oregon's Bureau of Labor & Industries concerning EPSD's discrimination against her. Ms. Hodges' claims against EPSD arise from injuries that the two of you, while acting within the scope of your employment, knowingly and intentionally inflicted upon Ms. Hodges concerning her efforts to exercise her constitutionally protected freedoms of speech and religion. Ms. Hodges intends to file suit in federal court under 42 U.S.C. § 1983 and Title VII, with related state law claims under the Oregon Constitution [specifically, Article I, §§ 2, 3, 8 and 20] and ORS 659A.030(1)(a) [Oregon's workplace discrimination law].

Please direct any correspondence concerning this notice of tort claim to the undersigned attorney at either the e-mail address or regular mail address listed below.

Page 1 of 6

**Statement of Facts**

Ms. Hodges is a teacher with 22 years of experience, the last two of them as an EPSD employee. She is also a devout Christian who sincerely believes that God immutably creates each person as male or female and that, accordingly, to affirm one's self-proclaimed transgender status in any way – whether by using a transgender person's chosen name rather than their given one, using the person's preferred pronouns, etc. – constitutes bearing false witness (i.e., lying), something the Bible explicitly prohibits. *See* Romans 3:4 ["(L)et God be true and every man a liar"] and Exodus 20:16 ["You shall not bear false witness against your neighbor"]. At the same time, Ms. Hodges subscribes to biblical principles requiring her to treat every person with dignity, love, and care, regardless of whether they share her beliefs or how they self-identify, because they are image-bearers of God. For this reason, Ms. Hodges made it a point to call students by the names listed in her gradebook: She would not refer to students by any preferred names that her gradebook did not reflect, be they nicknames – she would not call a student named Daniel, for instance, "Danny" or even "Dan" – or completely new names that the students had hand-picked for themselves. In Ms. Hodges' estimation, this constituted fair and equal treatment of all her students.

On September 8, 2021 – the first day of the 2021-22 school year – Ms. Hodges opened her fifth-period government class by explaining her policies concerning students' names and demonstrating good manners and respect for others. One student, who went by ████ – whose gender identity will not be disclosed here for purposes of compliance with the Family Educational Rights and Privacy Act ("FERPA") – asked Ms. Hodges why she would not honor transgender students' preferred names if respect mattered so much to her. Ms. Hodges explained that she was treating everyone fairly and equally by calling students by the names listed in her gradebook. ███ responded by yelling at Ms. Hodges, accusing her of "dead naming" – i.e., referring to a transgender person by the name given to him or her by the person's parents rather than the person's adopted name – and asserting that people like Ms. Hodges are "the reason all transgender kids try to kill themselves." Ms. Hodges attempted to de-escalate the situation, but was unsuccessful: ███ became angrier and angrier, ranting for roughly 30 to 40 minutes before threatening to leave Ms. Hodges' classroom. ███ then stormed out.

After the incident, Ms. Hodges became the target of harassment by both students and staff at EPHS: The same day as ███'s outburst, a student whom Ms. Hodges had never met came up to Ms. Hodges and accused her of being "disrespectful," "cruel," a "transphobe," and a "terrible and disrespectful person." The following day, another student by the name of ███ left a copy of Ms. Hodges' syllabus on her desk with the word "respect" circled in red. Ms. Hodges reported these incidents to her supervisor, Jen Mason, in the hopes that Ms. Mason would address the students' behavior.

On September 20, 2021, EPHS' assistant principal, Aaron Luksich, held the first of a series of meetings with Ms. Hodges in which Mr. Luksich pressured Ms. Hodges to change her position concerning students' preferred names. At one of those meetings, Mr. Luksich produced copies of district policies allegedly requiring her to use transgender students' preferred names, even if it went against the wishes of the students' parents, and ordered her to follow the policy. Ms. Hodges told Mr. Luksich that she did not feel comfortable doing that for professional, ethical, and religious reasons. Both of you, apparently, were aware of Mr. Luksich's harassment of Ms. Hodges.

▓'s disrespect of Ms. Hodges was by no means limited to a single incident – it continued well into the next semester: At one point, while Ms. Hodges was talking with another student and asking that student how she could help, ▓ walked past and said, "Be less transphobic." Ms. Hodges responded by taking ▓ to the office to be disciplined. En route, ▓ began to refer to Ms. Hodges by her first name, Jennifer, and said things like, "Don't you like legal names, Jennifer?" ▓ also continued to insult Ms. Hodges by calling her "transphobic" and "a killer of transgender kids."

Over the next two days, students sent Ms. Hodges screenshots informing her of a student group forming against her. At least one of Ms. Hodges' colleagues sent a text to another teacher calling Ms. Hodges transphobic. On February 9, 2022, ▓ and other students gathered outside Ms. Hodges' classroom to protest against her, with ▓ holding a sign that read, "Transphobes kill kids." Ms. Hodges responded by getting a sub to take over her classroom and leaving for the rest of the day, as she felt the atmosphere to be too toxic to perform her duties effectively. A series of meetings with EPHS administrators then took place over the course of the next week: At one of these meetings, on February 14, 2022, Heather Marinucci, EPHS' principal, informed Ms. Hodges that EPSD would not be renewing her contract for the 2022-23 school year because she was "not a good fit" for the District.

On May 9, 2022, EPSD terminated Ms. Hodges' employment for allegedly giving a student in a credit recovery class a grade the student did not earn. It is Ms. Hodges' position that the reason asserted for Ms. Hodges' firing was pretextual – a way for the District to, in essence, cover its backside after discriminating against her on the basis of her sincerely held religious beliefs.

**Legal Discussion**
Both the Oregon and U.S. constitutions protect individuals' right to freedom of speech. *See* Or. Const. art. I, § 8 and U.S. Const. amend. I. This right extends to religiously motivated speech, including – and for purposes of this case, especially – the speech of public employees:

> "The framers of the constitution would shudder if they were aware of [government] effort[s] to erode the right to express religious opinions. Based on the history of governmental infringement of religious expression, they founded our nation and our state on the principles of freedom of speech and of religious expression and practice. ***Those rights are not forfeited in the workplace.***"

*Meltebeke v. Bureau of Labor & Indus.*, 120 Or. App. 273, 292 (1992) (Edmonds, J., concurring) (emphasis added) [citing *Merrick v. Bd. of Higher Educ.*, 116 Or. App. 258 (1992)]; *see also Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407, 2413 (2022) [declaring that school districts cannot "treat( ) everything teachers and coaches say in the workplace as subject to government control"].

As the U.S. Supreme Court affirmed earlier this year, "the First Amendment's protections extend to '***teachers*** and students,' neither of whom 'shed their constitutional rights to freedom of speech or expression at the schoolhouse gate.'" *Kennedy*, 142 S. Ct. at 2413 (emphasis added) [quoting *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969)]. That includes teachers' religious freedom as well as their freedom of
Page 3 of 6

speech. *Id.* at 2421 [noting that even in a public-school environment, the First Amendment's Free Exercise Clause "protects not only the right to harbor religious beliefs inwardly and secretly. It does perhaps its most important work *by protecting the ability of those who hold religious beliefs of all kinds to live out their faiths in daily life* through the performance of (or abstention from) physical acts" (emphasis added) (internal quotations omitted)]. Article I, § 8 of the Oregon Constitution likewise restricts school districts' ability to restrict teachers' speech based on content or viewpoint. *Eagle Point Educ. Assn./SOBC/OEA v. Jackson Cnty. Sch. Dist. No. 9*, 880 F.3d 1097, 1108 (9th Cir. 2018) (*Eagle Point*).

"Whether speech of a [public-school teacher] is constitutionally protected expression necessarily entails striking 'a balance between the interests of the teacher, as a citizen, in commenting on matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.'" *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 284 (1977) [quoting *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968)]. In other words, while government employers may restrict their employees' speech to some degree, any restrictions imposed must serve an interest that outweighs the employees' expressive rights. *Tucker v. Cal. Dept. of Educ.*, 97 F.3d 1204, 1210 (9th Cir. 1996) [citing *Pickering*].

### A. The District's Interest in a "Safe" Environment for Students Does Not Outweigh Ms. Hodges' Right Not to Use Students' Preferred Names.

"If there is one fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion *or force citizens to confess by word or act their faith therein*." *W. Va. Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943) (emphasis added). Indeed, the United States' traditions "counsel mutual respect and tolerance, not censorship and suppression, for religious and nonreligious views alike." *Kennedy*, 142 S. Ct. at 2416; *see also Masterpiece Cakeshop, Ltd. v. Colo. Civil Rights Comm'n*, 138 S. Ct. 1719, 1721-22 (2017) [declaring that "the government, if it is to respect the Constitution's guarantee of free exercise (of religion), *cannot impose regulations that are hostile to the beliefs of affected citizens*" (emphasis added)]. The same can be said of the Oregon Constitution's provisions concerning religious freedom – both of which protect individuals' right of conscience. Or. Const. art. I, §§ 2 and 3.

Under the circumstances presented here, EPSD cannot show that it would have taken any adverse action against Ms. Hodges in the absence of Ms. Hodges' religious-based refusal to call transgender students by their preferred names. The District must therefore show that its interest in ensuring a mentally and emotionally safe environment for EPHS' transgender students outweighs Ms. Hodges' interest in adhering to her sincerely held religious convictions. The Supreme Court made clear last year that the District has no such interest – in fact, public schools, as "America's nurseries of democracy," have an interest in protecting unpopular expression. *Mahanoy Area Sch. Dist. v. B.L.*, 141 S. Ct. 2038, 2046 (2021). While some of Ms. Hodges' students – █████ in particular – may, at best, respectfully disagree with Ms. Hodges' refusal to call kids by their preferred names and, at worst, find her refusal abhorrent, "undifferentiated fear or apprehension of disturbance is not enough to overcome the right of freedom of expression" – or her freedom of religion, for that matter. *Tinker*, 393 U.S. at 508; *see also Eagle Point*, 880 F.3d at 1106 [quoting *Police Dep't of Chicago v. Mosley*, 408 U.S. 92, 101 (1972)].

Page 4 of 6

In addition, the Oregon Court of Appeals has declared that "[f]ree and open expression about sexual orientation is *clearly protected*" by Article I, § 8 of the Oregon Constitution, and such expression "'*may not be punished* in the interest of a uniform vision on how human sexuality should be regarded or portrayed.'" *Merrick*, 116 Or. App. at 264 (emphasis added) [quoting *State v. Henry*, 302 Or. 510, 525 (1987)]. This applies even, if not especially, in the context of educators who risk "be[ing] fired or subjected to other adverse 'personnel action' if they engage in such expression.'" *Id.* at 265.

## B. The District Cannot Cannot Restrict Ms. Hodges' Speech Based on How Her Students Might React.

"Where the lawfulness of speech turns on the reactions of others, the restriction is unconstitutional." *Sabelko v. City of Phoenix*, 846 F. Supp. 810, 822 (D. Ariz. 1994) [citing *Coates v. City of Cincinnati*, 402 U.S. 611, 611-14 (1971)]. Oregon law likewise protects teachers' right to call students by their given, rather than preferred, names:

> "Harassment [or the perception thereof] and annoyance are common reactions to seeing or hearing gestures or words that one finds unpleasant. Words or gestures that cause only that kind of reaction, however, cannot be prohibited in a free society, even if the words or gestures occur publicly and are insulting, abusive, or both. … '[A]mong the various historical crimes that are 'written in terms' directed at speech, those whose real focus is on some underlying harm or offense may survive the adoption of Article I, § 8 [of the Oregon Constitution], while *those that focus on protecting the hearer from the message do not*.'"

*State v. Johnson*, 345 Or. 190, 196-97 (2008) (emphasis added) [quoting *State v. Ciancanelli*, 339 Or. 282, 317 (2005)]. *Johnson*, the District should note, involved a truck driver who used sound-amplifying equipment to shout obscene and racist epithets at two women – one black, one white – whom he perceived to be lesbians. *Id.* at 192. Such conduct is far worse than anything Ms. Hodges has done. In other words, the fact that some students may deem Ms. Hodges' insistence on using students' given names "unwelcome conduct" is insufficient to constitute mistreatment of students. *See Tinker*, 393 U.S. at 509 ["In order for the State in person of a school to justify prohibition of a particular expression of opinion, it must be able to show that its action was caused by *something more than the mere desire to avoid the discomfort and unpleasantness* that always accompany an unpopular viewpoint" (emphasis added)].

## C. Pursuant to Title VII, the District Has a Duty to Accommodate Ms. Hodges' Religious Beliefs and Practices.

Title VII prohibits employers from discriminating against employees with respect to the employees' religion. 42 U.S.C. § 2000e-2. So, for that matter, does ORS 659A.030, Oregon's state law equivalent of Title VII – in fact, the analysis under both the federal and state statutes is identical. *Winnett v. City of Portland*, 118 Or. App. 437, 442 (1993).

Title VII defines "employer" as "a person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year[.]" 42 U.S.C. § 2000e(b). Since

the term "person" includes governments, EPSD qualifies as an employer under Title VII. 42 U.S.C. § 2000e(a). The term "religion," meanwhile, "includes *all* aspects of religious observance and ***practice***, as well as ***belief*** ..." 42 U.S.C. § 2000e(j) (emphasis added).

Under Title VII, employers must accommodate their employees' religious beliefs and practices where they can do so without undue hardship. *EEOC v. Abercrombie & Fitch Stores, Inc.*, 135 S. Ct. 2028, 2031 (2015). Oregon law likewise requires "reasonable accommodation of an individual based on the health and safety needs of the individual," including the individual's mental and spiritual health. *See* ORS 659A.030(5). "Undue hardship means something greater than hardship." *Anderson v. Gen. Dynamics Convair Aerospace Div.*, 589 F.2d 397, 402 (9th Cir. 1978). The fact that other employees might not like a co-worker's accommodation is not enough to establish undue hardship. *Id.*

In this case, the District could – and should – have accommodated Ms. Hodges' sincerely held religious beliefs by letting her call students by the names listed in her gradebook. Ms. Hodges meant no disrespect to anybody: If a student's preferred name was the name listed in her gradebook – as was the case with ▰▰ – Ms. Hodges would have used that name. A teacher is not a mere robotic functionary required to give a student his or her way in response to the student's temper tantrum – in fact, doing so would create an environment that not only isn't conducive to learning, but would create chaos in the classroom. Controversial though Ms. Hodges' practice of using students' given names may be, EPSD would have suffered no undue hardship in accommodating Ms. Hodges' religious beliefs by letting her refer to students by the names listed in her gradebook. In failing to accommodate Ms. Hodges' Christian faith pursuant to Title VII and ORS 659A.030(5), EPSD has sent a highly discriminatory message – i.e., that "Christians need not apply" to serve as teachers at EPHS or any other school within the District.

### Conclusion
"Vigilance is necessary to ensure that public employers do not use authority over employees to silence discourse, not because it hampers public functions but because superiors [may] simply disagree with the content of the employees' speech." *Moser v. Las Vegas Metro. Police Dept.*, 984 F.3d 900, 909 (9th Cir. 2021) [quoting *Rankin v. MacPherson*, 483 U.S. 378, 384 (1987)]. PJI thus respectfully takes this opportunity to remind EPSD of its commitment to providing a safe environment for all of its employees – including and especially Christian employees such as Ms. Hodges.

Thank you kindly for your time and attention to this matter.

Sincerely,

Ray D. Hacke
Staff Attorney
Pacific Justice Institute
P.O. Box 5229
Salem, OR 97304
E-mail: rhacke@pji.org

Page 6 of 6

# EXHIBIT "B"



CHRISTINA E. STEPHENSON
Labor Commissioner

June 30, 2023


JENNIFER HODGES
1100 TALON CIRCLE APT. 3B
JACKSONVILLE, NC 28546

RE:    Complainant:    Jennifer Hodges
       Respondent:     Eagle Point School District
       Case #:         STEMRG230317-60338


This letter is to inform you that the above-captioned complaint filed with the Civil Rights Division has been dismissed because the Division did not find sufficient evidence to continue our investigation. This is the Bureau's final determination. If you wish to pursue your claim(s) further, you may wish to consult an attorney regarding your right to file a civil suit.

NOTICE OF RIGHT TO FILE A CIVIL SUIT
This is your 90-day notice letter. Although this case has been closed, pursuant to ORS 659A.880, you, the Complainant, may file a civil action against the Respondent under ORS 659A.885 within 90 days after the date of mailing of this 90-day notice. Any right to bring a civil action against the Respondent under ORS 659A.885 will be lost if the civil action is not commenced within 90 days after the date of the mailing of this 90-day notice. *Note: If the complaint was a public accommodations case filed under ORS 659A.403 or 659A.406, the right to file suit in state circuit court expires <u>one year from the date of the alleged violation.</u>*

Further, if the Respondent is a public entity, to preserve the right to file a suit in state circuit court, the Complainant must also comply with the Oregon Tort Claims Act (ORS 30.260 to 30.300). Complainants interested in protecting these rights, should consult an attorney immediately regarding the requirements for filing. The Oregon State Bar referral number for Portland is 503-620-0222 or 800-452-7636.

If you wish to receive a copy of this file, you may place a request for public records online through our website www.oregon.gov/boli/publicrecords, or by calling 971-245-3844. There is no fee to receive a copy.

Sincerely,
CIVIL RIGHTS DIVISION
Administrative Support Unit

**Date of Mailing**: June 30, 2023

Enclosure(s)
cc:    Ray D Hacke, Complainant's Attorney

 Portland · Salem · Eugene         oregon.gov/boli
Help@boli.oregon.gov         971-245-3844
Ore. Relay TTY: 711        

# EXHIBIT "C"

# Date Calculator: Add to or Subtract From a Date

Enter a start date and add or subtract any number of days, months, or years.

Count Days     Add Days     Workdays     Add Workdays     Weekday     Week №

From **Friday, June 30, 2023**
Added 90 days

## Result: Thursday, September 28, 2023

### Calendar showing period from June 30, 2023 to September 28, 2023

| June 2023 0 days added | | | | | | | July 2023 31 days added | | | | | | | August 2023 31 days added | | | | | | | September 2023 28 days added | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Sun | Mon | Tue | Wed | Thu | Fri | Sat | Sun | Mon | Tue | Wed | Thu | Fri | Sat | Sun | Mon | Tue | Wed | Thu | Fri | Sat | Sun | Mon | Tue | Wed | Thu | Fri | Sat |
| | | | | 1 | 2 | 3 | | | | | | | 1 | | | 1 | 2 | 3 | 4 | 5 | | | | | | 1 | 2 |
| 4 | 5 | 6 | 7 | 8 | 9 | 10 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 3 | 4 | 5 | 6 | 7 | 8 | 9 |
| 11 | 12 | 13 | 14 | 15 | 16 | 17 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 10 | 11 | 12 | 13 | 14 | 15 | 16 |
| 18 | 19 | 20 | 21 | 22 | 23 | 24 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 17 | 18 | 19 | 20 | 21 | 22 | 23 |
| 25 | 26 | 27 | 28 | 29 | **30** | | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 27 | 28 | 29 | 30 | 31 | | | 24 | 25 | 26 | 27 | **28** | 29 | 30 |
| | | | | | | | 30 | 31 | | | | | | | | | | | | | | | | | | | |

☐ = Start date (Jun 30, 2023)    ☐ = Final result date (Sep 28, 2023)

 **Time & Date Calculator App for iOS**

See how long remains before a deadline or exactly when those 30 days are up.